IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 3, 2025

## IN RE MAISYNN Y.

**Appeal from the Juvenile Court for Knox County**
No. 307303   Timothy E. Irwin, Judge

_____

**No. E2025-00486-COA-R3-PT**

_____

This appeal involves a petition to terminate the parental rights of a mother to her daughter. The juvenile court found that the grounds of abandonment by an incarcerated parent, severe child abuse, and failure to manifest an ability and willingness to assume custody were proven by clear and convincing evidence. The juvenile court also determined that termination of parental rights was in the best interest of the child. The mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and JEFFREY USMAN,  JJ., joined.

Christine L. Dummer, Knoxville, Tennessee, for the appellant, Morgan Y.

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.


**OPINION[1]**

### I.    FACTS & PROCEDURAL HISTORY

This appeal involves the termination of the parental rights of Morgan Y. ("Mother") to her daughter, Maisynn Y.  Maisynn was born in late January 2024.  The same day, the Tennessee Department of Children's Services ("DCS") received a referral indicating that Maisynn was a victim of in utero drug exposure.  Maisynn was released from the hospital

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' last names to protect their identities.

on February 2, 2024, and immediately placed with her maternal grandparents. DCS filed a "Petition for Adjudication of Dependency & Neglect" on February 16, 2024. The petition asserted that Maisynn was dependent and neglected as to Mother and was also a victim of severe child abuse based on Mother's drug use while pregnant. The petition stated that Mother had met with a DCS worker and admitted to having used drugs several times throughout her pregnancy. According to the petition, Mother also admitted that she had been aware of the dangers such drug use posed to Maisynn's health. The juvenile court subsequently entered an order bringing Maisynn within its protective jurisdiction and permitting Mother only "strictly supervised visitation with the minor child." The order specified that these visits were to be supervised by "the custodians or by [DCS]." Unfortunately, Mother submitted to a drug screen on March 8, 2024, and tested positive for fentanyl. As a result, her visitation was suspended. Mother's visitation was later restored. However, she was informed that she could only participate in visits if she could pass a drug screen immediately prior to a visit taking place. She was also informed that her own mother would no longer be eligible to supervise visitation. A guardian ad litem was later appointed to represent Maisynn's interests throughout the proceedings.

Mother then began to participate in an intensive outpatient program at a treatment facility called "Cornerstone." On April 16, 2024, Mother appeared at the Cornerstone facility for a scheduled drug test. However, she had Maisynn in her physical custody in violation of the juvenile court's order. She proceeded to test positive for methamphetamine, amphetamine, and buprenorphine. The same day, the juvenile court entered an order removing Maisynn from her grandparents' custody and placing her in DCS custody. Mother was ordered to pay $40 per month in child support. A hearing was held on April 23, 2024, during which Mother attempted to explain her failed drug test. She claimed that, as she had been preparing to provide a urine sample, she dropped her sample cup into the facility toilet. The facility workers then "fished the cup out of the toilet" and informed her that she had tested positive for drugs. She denied having used drugs. However, she admitted that she knew she had been violating the juvenile court's order when she took Maisynn to the Cornerstone facility.

Following the April 23, 2024 hearing, a DCS representative met with Mother and explained that she was entitled to supervised visitation with Maisynn. She also informed Mother that, as she was on fentanyl protocol, she would be required to pass a drug screen immediately prior to any visit. Subsequently, DCS scheduled several visits for Mother. However, none of these visits took place because Mother either failed the required drug screen or simply failed to appear. Mother was arrested in Knoxville on June 11, 2024. She was charged with possession of methamphetamine with intent to manufacture, deliver, or sell. She was later convicted of this offense and received a sentence of "8 years [at] 30% suspended state probation" in addition to a fine. At some point, Mother was extradited to the state of Ohio based on an outstanding warrant for the possession of drugs. Mother was "bonded out" of the Ohio facility on August 7, 2024. She returned to Knox County shortly thereafter.

Meanwhile, the juvenile court conducted a hearing on August 6, 2024, regarding the dependency and neglect petition. Mother participated in this hearing virtually via Zoom while still incarcerated in Ohio. Subsequently, the juvenile court entered a written order, in which it determined that Mother had engaged in drug use after learning she was pregnant and knew or should have known of the harmful effects drug use would have on Maisynn's health. As a result, the juvenile court determined that Maisynn was dependent and neglected as to Mother and was a victim of severe child abuse. *See* Tenn. Code Ann. § 37-1-102(b)(27). DCS filed a petition to terminate Mother's parental rights on September 10, 2024. The petition alleged that the following grounds for termination existed: (1) abandonment by incarcerated parent through wanton disregard, (2) severe child abuse, and (3) failure to manifest an ability and willingness to assume custody.[2] DCS also asserted that termination was in Maisynn's best interest.

Following her release, Mother appears to have missed a DCS scheduled drug screen. She appeared for another screen on October 16, 2024, and tested positive for fentanyl. However, Mother was able to pass three drug screens administered during December 2024. During this time, she also participated in visitation with Maisynn. However, Mother again tested positive for drugs on January 6, 2025. She entered an inpatient rehabilitation program at Cornerstone but was "released" on February 4 for medical reasons. The following day, she was arrested in Knox County for violating the terms of her probation. Mother proceeded to trial on the termination petition on February 11, 2025. She remained incarcerated at the time and had a hearing scheduled for the following week. Additionally, the charges that Mother incurred in Ohio remained pending. She had signed a written plea agreement related to these charges, in which she agreed to plead guilty to two felony drug offenses. At the time of the trial, Maisynn had recently turned one year old.

Maisynn's foster mother ("Foster Mother") was the first witness called to testify. Foster Mother stated that Maisynn had been in her care for approximately ten months. She then explained Maisynn's various medical diagnoses. She stated that Maisynn had been diagnosed with "NAS," a "gag reflex in table foods," and had an eye misalignment called "pseudostrabismus." Maisynn also carries a sickle cell trait. Foster Mother explained that Maisynn's NAS diagnosis requires her to participate in several forms of physical therapy. She initially participated in physical therapy through the University of Tennessee but had shifted to the Grow With Me Clinic. Since coming into the foster home, Maisynn had participated in developmental therapy, feeding therapy, and physical therapy. At the time of trial, she was still participating in physical therapy twice per month to work "on her delayed gross motor [skills]." Foster Mother stated that Maisynn's issues caused delays in her reaching certain developmental milestones. However, Maisynn has progressed developmentally while in the home, and at the time of trial could crawl and sit. She was

---

[2] Mother was unmarried at the time of Maisynn's birth but identified Maisynn's father as a man named Harold R. His parental rights were terminated on November 19, 2024.

working to learn how to pull herself up to stand and to learn how to walk. As for her feeding issues, at the time that Maisynn came into Foster Mother's care, she "was showing no hunger cues. She wasn't crying in the middle of the night for a bottle." Additionally, she "was only taking 12 to 15 ounces [of milk,] which is about half of what she should have been taking for her age." She was also underweight when she arrived in the foster home but had steadily gained weight since that time. Maisynn was in the second percentile of weight for a child her age when she arrived at the foster home, but she had progressed to the tenth percentile. Foster Mother also described Maisynn's experience at the Grow With Me Clinic. Maisynn attends appointments at the clinic once every three months. She sees six different professionals including a nurse practitioner, a nutritionist, and a speech pathologist. Maisynn also has visits with the Tennessee Early Intervention System once per month. Foster Mother explained that she does not work outside the home and takes Maisynn to all of her appointments.

Foster Mother noted that she and her husband ("Foster Father") have several other children. Three of those children are college age and do not reside in their home full-time. The three remaining children are minors and do reside in the home. She stated that Foster Father works outside the home and their home has six or seven bedrooms and a loft. Foster Mother explained that Maisynn was sleeping in a crib in the foster parents' bedroom because she has trouble sleeping through the night and often needs to be soothed back to sleep. Once she is old enough, she will have her own bedroom. Foster Mother also stated that if Mother's parental rights were terminated, she and Foster Father intended to adopt Maisynn.

Next, Ms. Mackenzie Brown was called to testify. Ms. Brown is a DCS worker and has been Maisynn's family service worker since April 16, 2024. Ms. Brown stated that she met Mother shortly after the case began. She explained to Mother that she was entitled to visitation but it would need to be supervised. She also informed Mother that she had been placed on "fentanyl protocol" and therefore, she would be required to pass a drug screen immediately prior to her visits. Ms. Brown stated that the first visit was scheduled for April 30, 2024. However, this visit did not take place because Mother failed the required drug screen. The parties scheduled another visit for May 6, 2024, but Mother again tested positive for drugs. A third visit was scheduled for May 13, 2024. However, this visit did not take place because Mother "did not show up." Mother also failed to appear for visits scheduled for May 24 and May 28, 2024. Mother did appear for a visit scheduled for June 5, 2024. However, this visit did not take place because Mother again failed a drug screen. Another visit was scheduled for June 11, 2024. Mother again failed to appear, and she was arrested on drug charges later that day. Ms. Brown noted that at the conclusion of the August 6, 2024 hearing, Maisynn was found to have been the victim of severe child abuse perpetrated by Mother. She was asked whether she was aware of Mother having ever appealed this ruling. She responded, "[n]o, not to my knowledge."

Ms. Brown stated that she and Mother had discussed the need for treatment to

address her substance abuse issues. She noted that Mother had participated in various treatment programs. However, she had never provided documentation demonstrating that she completed any of these programs. Additionally, Mother had never provided proof of employment and had never paid child support.

Ms. Brown also noted that Mother participated in three visits with Maisynn during December 2024. She stated that, during this time, Mother maintained contact with DCS and "did well" with Maisynn during visits. Mother also provided Maisynn with diapers and Christmas presents. Mother passed drug screens on December 5th, 11th, and 19th. However, Mother took another drug test on January 6, 2025, and tested positive for fentanyl, cocaine, and opiates. Mother returned to the Cornerstone rehabilitation center but never provided documentation indicating that she had completed the program. Shortly after she left the facility, Mother was arrested, as her drug use constituted a probation violation.

Ms. Brown also discussed Maisynn's interactions with her foster parents. She stated that the foster parents were able to comfort and feed Maisynn properly. She also had no concerns about the relationships Maisynn had with the other family members living in the home. Conversely, Mother had never asked for the names of any of Maisynn's healthcare providers or any other medical information. Mother had attempted to attend one of Maisynn's medical appointments but was not permitted to do so because she failed a drug screen. Ms. Brown stated that she was concerned about Mother's ability to provide Maisynn with the "services" she required. Later, Ms. Brown was asked why DCS filed the termination petition less than seven months after the dependency and neglect petition. She responded, "[d]ue to the lack of visitation, we had to look at achieving permanency for the child."

Mother was the final witness to testify. She stated that she was incarcerated for a probation violation and had been incarcerated for a little less than one week. Mother later clarified that her probation violation was a result of the drug screen she failed on January 6, 2025. She was "notified" of this violation on February 5, 2025, one day after she had left the treatment program at Cornerstone. She stated that she enrolled in Cornerstone's treatment program on January 13, 2025. She was "medically discharged" on February 4 due to a heart issue. However, she claimed that this discharge had been "with completion." She also claimed that she had proof of completion but could not provide this proof due to her incarceration. Mother, who was 31 years old at the time of trial, was asked when she began using drugs. She responded, "I think meth when I was 23, and then fentanyl when I was like 26." Mother stated that she had been to substance abuse treatment four times in her life. Mother had also attended Cornerstone immediately after giving birth to Maisynn, but this program ended prematurely because she was medically discharged so she could undergo surgery. She attended an inpatient "detox center" in Ohio for two weeks. She was asked what her longest period of sobriety had been, and she stated, "I don't know exactly, but more than a year." She did not remember when this year of sobriety took

place. She did note that this period of sobriety had not been within the previous two years but claimed she had "been really trying[.]" She stated that she had admitted to her probation officer that she "did slip up and use fentanyl." She stated that the charges she had incurred in Ohio were still pending but she had already signed a plea agreement. She was unsure when she would be released but had a court date scheduled for the week following the trial.

Mother noted that she had a bachelor's degree in social work with a certification in drug and alcohol abuse counseling and phlebotomy. She had previously worked with the Safe Baby Court of Knox County. Mother was asked to describe Maisynn's medical needs. She stated that she knew Maisynn attended feeding therapy and physical therapy. She went on to say, "I know what I'm told. I know what I ask and what I'm told." She claimed that she would ensure Maisynn was taken to all appointments. However, she acknowledged that she could not do so while "sitting in jail." She later testified that she had not been employed since 2021, but she was confident she would be able to obtain a job once released from prison. She noted that she had a driver's license, owned a vehicle, and owned a two-bedroom home. She also claimed to have "baby items" in the home and noted that she had "family support," which would permit her to care for Maisynn financially. However, she later explained that while her house was debt-free, her mother helped her to pay "lot rent." Her mother had also purchased her car for her and helped her to pay for her car insurance.

On cross-examination, Mother claimed that her "sober date" was December 31, 2024. She noted that the "one slip up" that occurred that day caused her to fail the drug screen she took on January 6, 2025. However, she was attending narcotics anonymous and alcoholics anonymous meetings while incarcerated. She had also attended parenting classes. She was meeting with a therapist weekly and was taking medication for anxiety and depression. She also claimed that she had a relationship with Maisynn, and stated, "I believe she called me 'mama' once." This concluded Mother's testimony.

The juvenile court entered its final order on March 12, 2025. The juvenile court found that the grounds of abandonment by an incarcerated parent through wanton disregard, severe child abuse, and failure to manifest an ability and willingness to assume custody had been proven by clear and convincing evidence. The juvenile court also determined that termination was in the child's best interest. Mother filed this appeal.

## II. ISSUES PRESENTED

Mother presents the following issues for review on appeal, which we have slightly reframed:

1. Whether the juvenile court erred when it determined that two grounds for termination were proven by clear and convincing evidence: abandonment by an incarcerated parent and failure to manifest an ability and willingness to assume

- 6 -

custody of the child.

2. Whether the juvenile court erred when it determined that termination was in the best interest of the child.

For the following reasons, we affirm the termination of parental rights.

### III.   STANDARDS APPLICABLE TO TERMINATION CASES

"'A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.'" *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016)). "Parental rights have been described as 'far more precious than any property right.'" *Id.* (quoting *In re Carrington H.*, 483 S.W.3d at 522). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the child's best interest pursuant to the factors set forth in Tennessee Code Annotated section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

We review a trial court's factual findings *de novo* in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 523-24. However, "[w]hen a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary." *In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023). We make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and

convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review *de novo* with no presumption of correctness" as are any additional questions of law. *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV.    DISCUSSION

### A. Grounds for Termination

#### *1. Abandonment by an Incarcerated Parent*

The juvenile court determined that DCS proved the ground of abandonment by an incarcerated parent by clear and convincing evidence. The statute defining this ground contains multiple ways of establishing abandonment for termination of parental rights. *In re Navada N.*, 498 S.W.3d 579, 598 (Tenn. Ct. App. 2016) (quoting *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014)). Importantly, the parent's "incarceration is a condition precedent for this definition of abandonment." *In re Trenton B.*, No. M2022-00422-COA-R3-PT, 2023 WL 569385, at *3 (Tenn. Ct. App. Jan. 27, 2023) (citing *In re Navada N.*, 498 S.W.3d at 598). Accordingly, the statute provides additional circumstances that, when coupled with the parent's incarceration, lead to the conclusion the parent abandoned the child. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv)(a)-(c). One method of abandonment as defined by this section occurs where:

> [a] parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action if the child is four (4) years of age or more or three (3) consecutive months immediately preceding the filing of the action if the child is less than four (4) years of age and has:
>
> . . .
>
> (c) With knowledge of the existence of the born or unborn child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv)(c).

- 8 -

Here, the trial court found that Mother had (1) been incarcerated for a portion of the four months immediately preceding the filing of the petition to terminate Mother's parental rights and (2) engaged in conduct exhibiting a wanton disregard for Maisynn's welfare "through her continued drug use, numerous failed drug screens, and continued criminal conduct[.]" Mother claims that this ground for termination was not proven by clear and convincing evidence. She points to the drug screens she passed in December 2024 and her participation in the Cornerstone substance abuse program as evidence that she has attempted to achieve sobriety. She essentially asks that the relapse on December 31, 2024, not be held against her because such relapses are "an expected part of recovery." She also claims that she has not exhibited wanton disregard for Maisynn's welfare because her incarceration at the time of trial was the result of a probation violation stemming from this relapse, rather than a new criminal charge.

Regarding the statute's first requirement, the trial court seems to have applied the portion of the statute that pertains to children four years of age or older and assessed whether Mother was incarcerated for any part of the *four* months preceding the filing of the termination petition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). However, as Maisynn was less than four years old when the petition was filed, the juvenile court should have applied the three-month standard for a child less than four years of age. *See id.* This form of abandonment is applicable to a child younger than four years old when a parent has been incarcerated for all or part of the three months preceding the filing of the termination petition rather than four months. Tenn. Code Ann. § 36-1-102(1)(A)(iv). However, this error was harmless. As the juvenile court correctly noted, Mother was incarcerated from June 11, 2024, until August 7, 2024. The petition to terminate Mother's parental rights was filed on September 10, 2024. Therefore, Mother was clearly incarcerated for a portion of the three months preceding the filing of the termination petition, and the statute's first requirement was proven by clear and convincing evidence.

Turning to the issue of wanton disregard, "[w]e have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-868 (citing *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7-8 (Tenn. Ct. App. Jan. 11, 2005), *perm. app. denied* (Tenn. Mar. 21, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004); *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *In re C.W.W.*, 37 S.W.3d 467, 474-75 (Tenn. Ct. App. 2000)). Mother's behavior has certainly demonstrated a wanton disregard for Maisynn's welfare. Since Maisynn was born, Mother has been arrested for drug use and was rearrested based on a probation violation stemming from a failed drug test. She was incarcerated at the time of trial and had signed a plea agreement for drug charges pending in the state of Ohio. Except for one brief period of sobriety, Mother has used drugs consistently since Maisynn's birth. Perhaps

most indicative of a wanton disregard for Maisynn's welfare was Mother's decision to use drugs while pregnant with knowledge that such drug use could result in Maisynn experiencing significant health issues. Additionally, Mother has exhibited a wanton disregard for Maisynn's welfare through her failure to support her since birth. Mother has never paid any child support. Other than one instance of providing diapers and Christmas presents, Mother has never supported Maisynn in any way. Therefore, we affirm the juvenile court's determination that DCS proved the ground of abandonment by an incarcerated parent by clear and convincing evidence.

### 2. *Severe Child Abuse*

The juvenile court determined that DCS proved the ground of severe child abuse by clear and convincing evidence.[3] This ground for termination exists where:

> [u]nder a prior order of a court or by the court hearing the petition to terminate parental rights or the petition for adoption, a child has been found to be a victim of severe child abuse, as defined in § 37-1-102, and the parent or guardian has been found to have knowingly or with gross negligence either committed severe child abuse or failed to protect the child from severe child abuse.

Tenn. Code Ann. § 36-1-113(g)(4).

This Court has consistently applied the doctrine of res judicata to prevent a parent from re-litigating the issue of severe child abuse in a parental termination proceeding when the order finding the parent to be a perpetrator of severe child abuse has become final. *See In re Sawyer B.*, No. E2023-01497-COA-R3-PT, 2025 WL 1276693, at *7 (Tenn. Ct. App. May 2, 2025); *In re Colten B.*, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *5-6 (Tenn. Ct. App. Jan. 21, 2025); *In re Quentin G.*, No. E2023-01632-COA-R3-PT, 2024 WL 3324105, at *4 (Tenn. Ct. App. July 8, 2024). Res judicata is applicable "when 'an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction.'" *In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010) (quoting *Galbreath v. Harris*, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990)). "[A] severe abuse finding in a dependency and neglect action becomes final when it was not timely appealed

---

[3] Mother did not challenge the juvenile court's ruling on the ground of severe child abuse in her brief. Although this would typically result in the issue being waived, we will nonetheless review the juvenile court's findings as to each ground for termination pursuant to our Supreme Court's directive in *In re Carrington H. See In re Carrington H.*, 483 S.W.3d at 525-26. ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.")

following the dependency and neglect hearing." *In re Caydan T.*, No. W2019-01436-COA-R3-PT, 2020 WL 1692300, at *5 (Tenn. Ct. App. Apr. 7, 2020) (citing *In re Karisah N.*, No. M2018-00555-COA-R3-PT, 2018 WL 6179470, at *10 (Tenn. Ct. App. Nov. 27, 2018); *In re Dakota C.R.*, 404 S.W.3d 484, 497-98 (Tenn. Ct. App. 2012)).

Notably, the language of this ground for termination was recently amended by the Tennessee legislature. However, like the previous version, the statute continues to "make[] clear 'that the finding of severe abuse can be based on a prior court order . . . .'" *In re Quentin G.*, 2024 WL 3324105, at *4 (quoting *In re Brianna T.*, No. E2017-01130-COA-R3-PT, 2017 WL 6550852, at *4 (Tenn. Ct. App. Dec. 22, 2017)) (discussing the prior version). The new version of the statute still identifies a "prior order of a court" as an appropriate mechanism for the severe child abuse finding. Tenn. Code Ann. § 36-1-113(g)(4). Therefore, in our view, it remains "well settled that a trial court may rely on a prior court order finding severe child abuse as a ground for termination and is not required to re-litigate the issue of severe abuse during the termination trial, so long as the prior order is final." *In re Neamiah R.*, No. E2017-02000-COA-R3-PT, 2018 WL 2331868, at *6 (Tenn. Ct. App. May 23, 2018).

Returning to the pertinent language of the current statute, it provides that a ground for termination exists when "[u]nder a prior order of a court . . . a child has been found to be a victim of severe child abuse, as defined in § 37-1-102, *and* the parent or guardian has been found to have knowingly or with gross negligence either committed severe child abuse or failed to protect the child from severe child abuse." Tenn. Code Ann. § 36-1-113(g)(4) (emphasis added). Here, the juvenile court determined that Maisynn was the victim of severe child abuse as defined in § 37-1-102(b)(27), perpetrated by Mother, based on her use of drugs while pregnant. This determination was preserved in a written final order entered on August 26, 2024. In this order, the juvenile court described medical records presented as proof at the hearing, which showed that Mother met with her medical provider in August 2023, told them that she had used fentanyl, and was then counseled by her provider on the risks associated with using illegal substances during pregnancy, including NAS and DCS involvement. The records showed that Mother "voiced understanding of the risks." The records also showed that Mother refused to provide urine samples at some subsequent appointments, and at others, she tested positive for multiple illegal substances, including methamphetamine, morphine, and fentanyl. The records showed that Mother "was again counseled regarding the risks associated with substance use during pregnancy[.]" Based on this proof, the juvenile court determined that (1) Mother knew she was pregnant on or before August 21, 2023, (2) Mother used drugs "against the advice of medical professionals," and (3) Mother should have known that her substance abuse while pregnant could have adverse effects on Maisynn's health. It found Maisynn was the victim of severe abuse "based upon Mother's use of illicit substances during her pregnancy with this child *with the knowledge* that her use of illicit substances could cause serious bodily injury or death to her baby." (emphasis added). The juvenile court found in the order terminating Mother's parental rights that she never appealed these

findings. This finding is supported by the record.

Mother has neither disputed the previous order nor raised any issue on appeal regarding this ground for termination. Because a final order of the juvenile court found that Maisynn was a victim of severe child abuse, pursuant to Tennessee Code Annotated section 37-1-102(b)(27), and Mother was found to have knowingly or with gross negligence committed severe child abuse, this ground for termination of her parental rights "is effectively established." *In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011). Therefore, we affirm.

### 3. Failure to Manifest an Ability and Willingness to Assume Custody of the Child

The juvenile court determined that DCS proved the ground of failure to manifest an ability and willingness to assume custody of the child by clear and convincing evidence. This ground exists where a parent:

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). To prove this ground, the petitioner must prove two "prongs" by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d at 674. The first prong is that "the parent . . . failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[.]" *Id.* This is satisfied by "clear and convincing proof that a parent . . . has failed to manifest either ability or willingness[.]" *Id.* at 677. "A parent's ability to assume custody or financial responsibility is evaluated based 'on the parent's lifestyle and circumstances.'" *In re Trenton B.*, No. M2022-00422-COA-R3-PT, 2023 WL 569385, at *6 (Tenn. Ct. App. Jan. 27, 2023) (quoting *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614 at *5 (Tenn. Ct. App. Apr. 9, 2020)). "When evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). The second prong requires proof that "placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d at 674.

Here, the juvenile court determined Mother's drug use demonstrated that she lacked the ability to care for Maisynn. The juvenile court also found that a risk of substantial harm existed based on Mother's drug use and her lack of knowledge regarding Maisynn's medical needs. Mother claims that she demonstrated an ability and willingness to assume custody of Maisynn. She points to her testimony that she completed a drug treatment program after her most recent drug use and was attending narcotics anonymous and

alcoholics anonymous meetings while in prison. She also claims that the "small amount of time" between Maisynn being taken into DCS custody and the filing of the termination petition was "not adequate to allow [her] to get clean, complete treatment[,] . . . and to allow her sufficient time to demonstrate [the] ability to provide a suitable home for the child." She claims that her rights were "prematurely terminated."

Mother's drug use clearly demonstrates that she lacks the ability to care for Maisynn. *See In re Riley B.*, No. E2022-00684-COA-R3-PT, 2023 WL 3477216, at *4 (Tenn. Ct. App. May 16, 2023) (finding that a mother's long history of drug abuse which was not fully resolved at the time of trial constituted clear and convincing evidence "that she failed to manifest an ability to assume custody of the children"). Mother's addiction has persisted throughout these proceedings and has prevented her from effectively parenting Maisynn. Mother's drug use while pregnant resulted in Maisynn being removed from her custody shortly after she was born. Her drug use since Maisynn's birth has resulted in multiple periods of incarceration. Mother even tested positive for drugs the one time she had Maisynn in her sole care. Mother has never properly addressed these issues. Mother also failed to demonstrate an adequate understanding of Maisynn's medical needs. She stated that she was aware Maisynn had certain medical needs and attended feeding therapy and physical therapy. She also claimed that she would ensure Maisynn attended all necessary doctors' appointments. However, Mother failed to explain the breadth of Maisynn's needs in any detail. She also did not expound upon how she intended to attend Maisynn's appointments if she were working the amount necessary to support her financially.

Additionally, we find no merit in Mother's claim that her parental rights "were prematurely terminated." Nothing in the definition of this ground for termination requires DCS to wait a statutory period prior to filing a petition to terminate parental rights. *See* Tenn. Code Ann. § 36-1-113(g)(14). Further, Mother's claim does not otherwise address any of the circumstances necessary for this ground for termination to be established. Additional time would not have undone either the behavior leading to Mother's incarceration or the conduct demonstrating a wanton disregard for Maisynn's welfare. Even if this argument were otherwise cogent, Mother's claim is undercut by the fact that she has not taken advantage of the time she has been given. She has failed to pay child support throughout the proceedings. She also missed several scheduled visits with Maisynn due to failed drug screens. She missed several other visits by simply failing to appear. Further, she has demonstrated little to no progress in rectifying the issues preventing reunification with Maisynn. While we commend Mother for her participation in several drug treatment programs, she failed to submit proof to both DCS and the juvenile court that she completed any of these programs. She certainly has not used the programs properly as despite her attendance, she has continued to test positive for drugs.

Mother has also failed to demonstrate an ability to care for Maisynn financially. She has been unemployed since 2021. Mother has relied on her family to pay her lot rent, car

- 13 -

insurance, and other bills since that time. She has not demonstrated any ability to personally provide for Maisynn. While she did claim that she believed she would be able to obtain employment upon release from prison, Mother did not explain what specific role she expected to obtain.

Further, we agree with the juvenile court's determination that Mother's continued drug use and ignorance of Maisynn's medical needs demonstrate a sufficiently probable risk of substantial harm to Maisynn's physical and psychological welfare. Therefore, we affirm the juvenile court's determination that DCS proved this ground for the termination of Mother's parental rights by clear and convincing evidence.

## B. Best Interest of the Child

Having determined that the juvenile court did not err when it found DCS proved three statutory grounds for termination existed, we now consider whether the termination of Mother's parental rights was in Maisynn's best interest. However, prior to addressing the statutory factors, we address Mother's claim that the juvenile court did not make sufficient findings regarding the best interest factors. This claim is patently without merit. In its final written order, the juvenile court considered each of the 20 statutory factors individually. The trial court listed the factor, stated whether the factor weighed in favor of termination, and then explained the facts and analysis leading to this determination. We are perplexed by Mother's decision to raise this argument in lieu of constructing an argument addressing the weight given to the statutory factors. She has not addressed any of the statutory factors in her brief or attempted to explain why the factors weigh against termination of Mother's parental rights. Regardless, we will review the statutory factors in accordance with our Supreme Court's directive in *In re Carrington H*. *See In re Carrington H.*, 483 S.W.3d at 525-26 ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.")

The factors to be considered are set out in Tennessee Code Annotated section 36-1-113(i), which states:

> (i)(1) In determining whether termination of parental . . . rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
>
> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). Many of these factors are interrelated. Therefore, we address several of them in concert.

First, we consider those interrelated factors concerning the child's need for stability and continuity of placement, the effect the potential change of caretakers and physical environment would have on the child, and her parental attachments and emotionally significant relationships with persons other than parents and caregivers. Tenn. Code Ann. § 36-1-113(i)(1)(A), (B), (H), and (I). Maisynn has experienced stability in her foster home. She has resided there for most of her life and, by all accounts, is treated as a member of the family. She is provided for financially and is taken to her various doctors' appointments and physical therapies. Foster Mother testified that she and Foster Father intend to adopt Maisynn if Mother's parental rights are terminated. Conversely, Mother has certainly not taken the time or steps necessary to form a healthy parental attachment

with Maisynn. She missed numerous visits by either testing positive for drugs or simply failing to appear. While she did visit Maisynn and provide her with diapers and Christmas presents during a brief period of sobriety in December 2024, she has otherwise separated herself through her consistent drug use and periods of incarceration. She has not made a lasting commitment to her relationship with Maisynn and has not made significant progress in overcoming the obstacles preventing a relationship from being formed. Therefore, factors (A), (B), (H), and (I) each weigh heavily in favor of termination.

Next, we consider the interrelated factors concerning Maisynn's interest in stable and secure housing and parenting. Tenn. Code Ann. § 36-1-113(i)(1)(C), (D), (E), (F), (G), and (O). Mother has not demonstrated any continuity or stability in meeting Maisynn's needs. She has been incarcerated for a large portion of Maisynn's life. She has spent much of the time in which she has not been incarcerated abusing drugs. Except for the brief three-week span in December 2024, Mother has consistently separated herself from Maisynn through her substance abuse. Additionally, Mother has made no attempt to provide for Maisynn and has not demonstrated that she has the ability to do so. She has never made a child support payment. She has been unemployed since 2021 and has relied on her family to support her since that time. While she claimed at trial that she would be able to obtain a job upon release from prison, she did not explain what job she intended to obtain or whether there was an employer prepared to hire given her criminal history. Further, there are no facts contained in the record indicating that Mother would be able to cultivate a healthy parental relationship with Maisynn in the future. Therefore, we find that factors (C), (D), (E), and (O) weigh in favor of termination. However, although factors (F) and (G) also pertain to Maisynn's interest in a stable home, she has never resided with Mother. Therefore, these factors are neutral in this case.

Factors (L) and (K) both concern the reasonable efforts of DCS to assist the parent and the parent's inclination to engage in DCS offered services. The trial court found that DCS made reasonable efforts to assist Mother throughout this case by scheduling visits, providing drug tests, conducting child and family team meetings, and making treatment available to Mother. We agree. Mother has shown an inclination to participate in services offered. She has participated in drug rehabilitation four times. She also testified that she had taken parenting classes and was participating in narcotics and alcoholics anonymous. However, she has not taken proper advantage of these resources. Despite her experience in drug treatment programs, Mother has continued to use drugs throughout these proceedings. As the juvenile court noted, this issue is compounded by the fact that Mother has a college degree specializing in the treatment of such issues. Clearly, Mother is aware of the steps necessary to alleviate her substance abuse issues but refuses to employ them. Therefore, factors (L) and (K) both weigh in favor of termination.

Factor (N) considers whether the parent or a person residing with the parent has ever exhibited brutality, physical, sexual, emotional, or psychological abuse toward others. As stated above, Mother has been adjudicated as a perpetrator of severe child abuse against

- 17 -

Maisynn due to her use of drugs while pregnant. Therefore, this factor weighs in favor of termination.

Regarding factor (S), Mother has made no financial contribution to Maisynn's support. Tenn. Code Ann. § 36-1-113(i)(1)(S). Mother never paid any of her court ordered child support even though it was set at a mere $40 per month. Mother did provide Maisynn with diapers and Christmas presents a single time. This is obviously not the consistent and substantial financial contribution necessary for the support of a child. Therefore, this factor weighs heavily in favor of termination.

Finally, we consider the interrelated factors concerning the parent's adjustment of circumstances detrimental to the child's environment, health, and psychological welfare. Tenn. Code Ann. § 36-1-113(i)(1)(J), (M), (P), (Q), (R) and (T). Mother has not adjusted to the circumstances preventing her from caring for Maisynn. She was incarcerated at the time of trial and was unsure when she would be released. She had additional charges pending out of state and had signed a plea agreement. Mother has not made any concrete plans for her future upon release. At the time of trial Mother had been unemployed since 2021. Her only testimony regarding her ability to care for Maisynn in the future was that she believed she would be able to find a job and intended to rely on "family support." Additionally, Foster Mother gave detailed testimony regarding Maisynn's medical treatment and stated that she was able to take her to all medical appointments. Conversely, when asked about Maisynn's medical conditions Mother was unable to explain them in any capacity stating only that she knew Maisynn attends physical therapy and feeding therapy. Finally, concerning Mother's emotional maturity, the trial court determined that this factor weighed in favor of termination because while Mother "appears intelligent and [ ] is educated with tremendous potential [ ] her drug use impairs her judgment and prevents her from doing the right thing for her child." We agree. Therefore, factors (J), (M), (P), (Q), (R), and (T) each weigh in favor of termination of Mother's parental rights.

Having carefully reviewed the record, we conclude that the proof does not preponderate against the juvenile court's factual findings, and we conclude that the facts, viewed as a whole, amount to clear and convincing evidence that termination of parental rights is in Maisynn's best interest. *See In re Neveah M.*, 614 S.W.3d at 680. Therefore, the ruling of the juvenile court is affirmed.

## V.    CONCLUSION

For the foregoing reasons, we affirm the decision of the juvenile court. Costs of this appeal are taxed to the appellant, Morgan Y., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE